90 So.2d 397 (1956)
Charles JACKSON
v.
STEEL FABRICATORS, Inc., and Central Surety & Insurance Corporation.
No. 20675.
Court of Appeal of Louisiana, Orleans.
October 29, 1956.
Rehearing Denied November 26, 1956.
Writ of Certiorari Denied January 21, 1957.
*398 Claude F. Kammer, New Orleans, for plaintiff-appellant.
*399 Beard, Blue & Schmitt, A. J. Schmitt, Jr., New Orleans, for defendants-appellees.
JANVIER, Judge.
On December 16, 1952, while carrying out hazardous features of the business of his employer, Steel Fabricators, Inc., plaintiff sustained serious physical injuries. He was engaged in hooking a cable to a bundle of reinforcing iron rods when the cable or the strap which held the pieces of iron together broke, and he was knocked down and sustained compound comminuted fractures of both bones of his left leg a few inches above the ankle. He was taken to Charity Hospital and then to the Flint-Goodridge Hospital. The bones were set and it was deemed advisable to apply a six-hole stainless steel plate to the tibia which is the larger of the two bones of the leg between the knee and the ankle. This was done and the leg was placed in a full length cast which was changed from time to time until, on June 13, 1953, a new cast (apparently shorter) was applied. On July 29, 1953, this cast was removed and plaintiff was advised to "begin normal weight bearing," which we understand to mean that he was to attempt to use the leg but not that he was to go back to work. At that time he was sent to another medical expert for "preliminary physical therapy." The surgeons in charge rendered a report in which they said that in their opinion "it will not be too many weeks before he will be eligible for discharge." On October 6, 1953, the surgeons again advised "after several weeks of physical therapy when the ankle and knee joint are completely free, it is felt that the patient can be discharged to return to work."
On November 21, 1953, the surgeon in charge, as a result of an examination made on November 18th, reported that, although there remained "three-eighths inch atrophy of the thigh and slight thickening through the ankle joint which is minimal," and although plaintiff had a "five per cent permanent disability of the tibia in relation to the lower extremity as a whole," the "only limitation of ankle motion was the last five degrees of plantar flexion, dorsiflexion being comparable with the opposite side." The surgeon stated in his report that the employee "may return to his former occupation." He was paid compensation from the time of the accident to November 18, 1953.
Feeling that he had not recovered and was still totally and permanently disabled, he brought this suit against his employer, Steel Fabricators, Inc., and its insurance carrier, Central Surety & Insurance Corporation, praying for solidary judgment against defendants at $30 per week for 400 weeks subject to credits for the weeks for which compensation had been paid. He also prayed for $500 for medical expenses incurred, for penalties at 12% of the total amount, for an attorney's fee of $1,000, and for such expert witness fees as might be incurred.
Defendants admitted the occurrence of the accident, the nature of the employment, and that plaintiff had been totally disabled for the period mentioned, but denied that any further disability had resulted.
In the District Court there was judgment in favor of plaintiff and against defendants solidarily for $30 per week for a period of 18 weeks from and after November 18, 1953, and there was further judgment of $3.54 per week for a period of 175 weeks of which, according to the judgment, the sum of thirty-six cents per week represented a penalty of 12% on $3 per week, and there was further judgment in the sum of $150 as an attorney's fee and fixing the fee of a medical expert at $100.
From this judgment plaintiff has appealed. Defendants have neither appealed nor answered the appeal.
It is the contention of plaintiff that he has actually sustained not only the impairment of the use of the ankle but that that impairment has in fact been disabling to such an extent as to prevent his engaging *400 in any work substantially similar to that in which he was engaged prior to the accident, and counsel for plaintiff also argues that, in determining whether an employee has been disabled, it is of no importance that it be decided whether he was a skilled employee or was merely a common laborer.
Counsel for defendants, on the other hand, maintain that although plaintiff did sustain a serious injury and although he was totally disabled for many months, he is now able to engage in his former work and that, although the use of his left ankle is slightly impaired, that impairment does not affect his ability to do such work, and counsel for defendants also argue that plaintiff was employed as a common laborer and that this fact should be taken into consideration in determining whether or not disability had resulted.
It is evident that the District Judge reached the conclusion that plaintiff could again engage in work similar to that in which he had been previously engaged and that therefore there remains no disability but merely a slight impairment of the use of the ankle or leg, for he allowed compensation of $3.18 per week for 175 weeks, which is the period fixed in our compensation laws for the loss of a leg. LSA-R.S. 23:1221(4) (h). Had he felt that partial disability resulted, he would necessarily have based the award on LSA-R.S. 23:1221(3), which provides for compensation payments for 300 weeks where there is "partial disability to do work of any reasonable character * * *."
Were it not for the decision of our Supreme Court in Bean v. Higgins, Inc., 230 La. 211, 88 So.2d 30, 32, we would be content to say that only a question of fact is involved, i. e., whether plaintiff, as a result of the impairment, is disabled and we would have found it difficult to say that, in deciding that question of fact as he did, the District Judge was manifestly in error. However, the decision in the Bean case is confidently relied on by counsel for plaintiff as establishing two legal principles. First, that it is of no importance in a compensation case that it be determined whether an employee is a skilled workman or is a common laborer, and, second, that if there is an impairment of the use of a member, such as an arm or a leg, there necessarily results either total or partial disability.
On the first of these questions it has always been our view that it is sometimes quite necessary to determine whether the injured employee was skilled or was only a common laborer. We have always felt, and we still feel, that if an employee becomes particularly skillful in some work which requires special experience or knowledge and, as a result of an industrial accident, is unable to again engage in that particular specialized service, he is totally disabled even if it is found that he can do other things quite different from those in which he had acquired the special knowledge and experience.
On the other hand, we have felt, and still feel, that if a common laborer sustains injury which may prevent him from engaging in one or two or even a few particular kinds of common labor but that he is nevertheless able to do many other kinds of common labor, he is not totally disabled and is entitled to compensation for partial disability in some cases where his ability to earn has been reduced, or to compensation based on the impairment of the member where that impairment has not resulted in the reduction of his ability to earn.
The decision of the Supreme Court in the Bean case, as we have said, is relied on by counsel for plaintiff as annihilating those views which we have just set forth. We cannot agree that the decision has that effect. On the contrary, the Supreme Court seems to recognize the difference between the two mentioned groups of employees, that is, the skilled employee and the common laborer, and all that the Court said in that case was that under the *401 facts found there, the distinction was of no importance because even if that employee should be considered as a common laborer, he could no longer "perform heavy manual labor", that is, any kind of heavy labor.
The Court very clearly said that, under the facts shown there, the plaintiff probably should be considered as a skilled employee, for it said that he was a welder's helper and although, as such, he was not so skilled as a welder would be, he "receives compensable wages", and that thereafter he would "never be able to resume the work of a welder's helperthe occupation he was engaged in at the time of his injury", but the Court was very careful to say that even if he was not a skilled employee, nevertheless, as already stated, as a common laborer he could no longer perform common labor. Why this discussion if in no case should there be recognized a distinction between the disability of a skilled workman and the disability of a common laborer?
The Supreme Court clearly seems of the opinion that there is a distinction in some cases and that therefore in such cases it may be necessary to determine whether the employee is skilled or not.
In the case at bar we have no doubt whatever that plaintiff should be classified as a common laborer. His work required that he place a strap around the ends of bundles of reinforcing irons in order that those bundles may be raised by a crane operated by another employee. Surely no skill, special experience or study was required. Pete Tripolino, who was employed by Steel Fabricators, Inc., "in a general supervisory capacity," said that the particular work in which plaintiff was employed "is laborer's work." In addition to the evidence showing the kind of work the plaintiff did, the record shows that the District Judge, during the trial said: "I presume it isn't a skilled occupation." To this statement no protest or objection came from counsel for plaintiff.
When we come to consider the second contention of counsel for plaintiff as to the effect of the decision in the Bean case, that it establishes the principle that where there is impairment there necessarily results disability, either total or partial, again we find ourselves unable to so interpret that decision. What the Court said there was not that there is always disability when there is impairment, but that under the facts of that particular case, there was disability. It based this conclusion on the determination of an issue of fact, not of law, and, among other facts, is the particular finding which the Court made, that in the course of an experiment which was made during the trial in the District Court "plaintiff could not even pick up a book with the injured hand." The Court said that whether or not there is disability in any case must depend not on whether there is an impairment of the use of a member but on whether the record shows that impairment has produced disability.
"In the decision of workmen's compensation cases, each case must depend on its own peculiar facts, and from these facts as related we should apply what is prescribed in the statute. Therefore, we cannot be bound by isolated fragments of jurisprudence considered separate and apart from the circumstances of fact which evoke them. On the facts, as applied to a liberal construction of the law, the case must stand or fall. We should not be bound by previous dicta of decided cases which relate in a general way to the issues at hand. The facts may be different. The utterings of courts of appellate jurisdiction in these cases are not sacrosanct; rather, we are obliged to weigh them in the light of all facts and circumstances, * * *."
We find then that, instead of being controlled by any previous decisions and instead of being bound by the Bean decision to hold that since there is impairment there must be disability, it is necessary that we *402 examine the record here and, having found that plaintiff was a common laborer, decide whether the finding of the District Judge, that he was no longer disabled but had merely suffered the permanent impairment of the use of the left leg, was manifestly erroneous.
We proceed to a consideration of the evidence in an effort to determine whether plaintiff was able to return to such work as he had previously done and while, because of our conclusion on this question, it is of little if any importance to decide whether he was or was not a common laborer, we believe that the evidence shows that no special skill or experience was required in the carrying out of his work as a common laborer.
We do not see that any useful purpose would be served by a detailed discussion of the very complicated medical testimony and shall, so far as possible, confine ourselves to a discussion of the conclusions reached by the various experts.
On behalf of plaintiff, Dr. Blaise Salatich testified that in his opinion plaintiff was permanently totally disabled and that he could not, without pain and suffering, do work similar to that in which he had previously engaged. He did, however, say that, so far as the knitting of the bones and as the application of the plate were concerned, the plate itself did not cause pain, the knitting was as perfect as it could be, that the bones were probably stronger than before, and when asked as to the ability of plaintiff to carry out work of the nature similar to that previously done, he said:
"* * * this man may be capable of carrying on a physical activity as described, but that does not mean he can continue it."
He did say that if the plaintiff stood on his feet for any long period of time, such as four or five hours, the leg would probably pain him and would probably prevent his continuing at work. At this part of his testimony, Dr. Salatich apparently felt that such suffering as plaintiff might endure would result from weather changes, and he said that it was possible that in such situations such an injury might not cause pain for a long time, possibly as much as a year, and that then it would not be improbable that pain might be suffered even after so long a time.
While we cannot ascertain from the record the extent of the examination made by Dr. Salatich, nor the time consumed in that examination, it was stated during the argument that he had seen plaintiff only once and that this was after plaintiff had employed his present attorney.
Plaintiff also contends that the report of the Veteran's Hospital shows that he was still disabled when he was sent to that institution by his attorney. About two months after the suit had been filed, plaintiff's attorney did send him to the said hospital, and on February 17, 1954, he apparently was examined there as the following statement appears in the hospital report:
"Pts complaints referable to left leg which was fractured in three places. Pt. has swelling in area of fracture. Pt. referred back to L.M.D. who rxd fracture."
Counsel for defendants maintain that that statement does not indicate that the doctor actually found a swelling, but that it merely indicates that he was told by the plaintiff that there was a swelling. The report does not show that he was given any treatment at all, but it does show that he was told to come back for X-ray photographs and that, as a result of the X-ray photographs, the doctor in charge at the hospital made the following report on the record:
"I do not believe hospitalization for removal of this plate and screws is indicated at this time."
At any rate, nothing was done and apparently the conclusion at the hospital was *403 that nothing should be done for the report contains the following statement:
"* * * There is an old Lane plate on the lateral aspect of the tibial fracture in place by six metallic screws. There is no bony reabsorbtion about the metallic screws nor evidence of ostee. CON: Old well healed fracture as described."
In addition to the testimony of Dr. Salatich, plaintiff himself testified as to the pain which he suffers and also as to his attempts to go back to work. He said that he had on two occasions attempted to do lighter work, but had suffered so that he found it impossible to continue.
The testimony of plaintiff that he continues to suffer and that his leg is badly swollen at times is corroborated by his mother, and it is conceded that his stepfather, had he been placed on the stand, would have given the same testimony, and it is also corroborated by the operator of a shoe-shine establishment for whom he worked for a short time. These several lay witnesses give what we think is rather exaggerated testimony as to the condition of plaintiff's leg for, although all the doctors produced by defendants were of the opinion that there was no cause for swelling, these witnesses used the word "swole", and in the testimony of one of them appears the statement that it was a "mess". The defense doctor, who said that at times there was slight swelling, said that it would not cause disability.
As opposed to this lay evidence, Gus Colombo, the receiving clerk at the Solari Grocery Store, said that the plaintiff had been employed as "yard boy" and that during the course of his employment he was required to handle a heavy hand truck which weighed 500 or 600 pounds and that sometimes there were articles weighing as much as 1,000 pounds which were handled by him on his truck. He said that plaintiff was a "real good worker," that he never complained, and that he had left the employment without giving any reason except that he said he "wasn't feeling well."
F. M. Zweifel, personnel director of the employees, said that he had offered plaintiff his former job at the same rate of pay but that plaintiff would not come back and "try".
The medical experts who testified on behalf of defendants are unanimous in the view that plaintiff could return to his former employment if he were willing to do so. In addition to the testimony of these doctors there were introduced reports made by them during the course of Jackson's recuperation and at the time of his discharge, and they do not agree with Dr. Salatich in his opinion that he is permanently, totally disabled, or, in fact, that he is now disabled at all, though they do state that the use of the ankle has been impaired to the extent of about ten per cent, which they all agree does not interfere with his ability to do such work as he was doing before the accident.
Dr. Schlesinger and Dr. Soboloff who, before the death of Dr. Schlesinger, were associated in the practice as orthopedic specialists, were in charge of the setting of the bones of the leg and the application of the plate and were in constant attendance during the many months of plaintiff's convalescence. Dr. Soboloff described the operation and subsequent treatment and testified from a report which he had made and said that Jackson had
"a five per cent permanent disability of the tibia in relation to the lower extremity as a whole, and is able to return to his former occupation at full capacity."
Dr. Battalora, an orthopedic expert, made a thorough examination of Jackson and made a report as a result of that examination. He was of the opinion that
"this man should be able to resume his previous occupation. I would estimate this disability at about 10% loss of use of the left leg."
*404 We note that the "disability" referred to was in the use of the leg and did not affect the ability of the plaintiff to do the work he had previously done. In other words, that it did not interfere with his being able to resume his previous occupation. It is true that Dr. Battalora found some swelling at the time of his examination but felt that neither that nor anything else would prevent his ability to return to work.
Dr. Andrews, the industrial physician who first saw Jackson and arranged for Drs. Schlesinger and Soboloff to set the bones and apply the plate, was asked:
"Do you believe that Jackson could return now and do the same kind of work that he had been doing?"
and he answered:
"I am satisfied that he could. I think he has got as close to a perfect result of a broken leg as you can get."
During the trial, counsel for plaintiff diligently attempted to persuade Dr. Andrews to say that there was a difference between the appearance of Jackson's two legs. He said that, except for the scar, he could see no difference whatever, and when, during the trial, counsel for plaintiff attempted to have the District Judge make a statement as to the difference between the two legs, the Judge said that that was a matter for the doctors to determine.
Our conclusion is that there can be no doubt that plaintiff has suffered a slight impairment in the use of his leg, but we agree with the finding of the District Judge that this impairment did not affect his ability to work.
We think that the allowance in the judgment of $30 per week for 18 additional weeks obviously resulted from the fact that even the attending surgeons of defendants, when plaintiff was discharged on November 18th, were of the opinion that it would be several weeks before he could go back to the same kind of work which he had been doing without some pain, and that the Court felt that he should be allowed compensation for that period which was fixed at 18 weeks.
The allowance of 12% penalty on payments of $3 per week for 175 weeks obviously resulted from the conclusion of the District Judge that, since the experts of defendants felt that even though plaintiff had fully recovered his ability to work, he had sustained a slight impairment of the use of his ankle and that therefore the refusal of defendants to tender compensation, based on the minimum fixed by the statute for the partial impairment of the use of a member of the body, was arbitrary and capricious.
Where there is no disability but an impairment of the use of a member of the body, the award should be based on that portion of the statute which awards compensation not for disability but the loss of the use of a member. What we said in a similar situation, which we found in O'Connor v. American Mutual Liability Ins. Co., La.App., 87 So.2d 16, 25, was correct:
"The correct method of computing compensation for the permanent partial loss of use of the function of a member is to take the proportion of the partial loss from 65 per cent of the weekly wage and allow such amount as compensation for the number of weeks permitted for the total loss of the respective member. Cooper v. Employers Liability Assurance Corporation, Limited, La.App., 80 So.2d 180; Morgan v. Standard Accident Ins. Co., La.App., 51 So.2d 107; Storm v. Johnson, La.App., 23 So.2d 639; Smith v. Turner Lumber Co., La.App., 174 So. 699; Thornton v. Haynesville Lumber Co., Inc., La.App., 155 So. 784. The pertinent provisions are LSA-R.S. 23:1221(4) (f, n, o) and the result is that the compensation rate is 10 per cent of 65 per cent of $16.55 or $1.07 per week for 200 weeks, * * *."
*405 We think it well settled that in computing compensation, where there is disability, either total or partial and there is also the loss or the impairment of the use of a member of the body, the plaintiff is entitled to recover either for the impairment of the use of a member of the body or for the disability, whichever would produce the greater amount. There cannot be recovery for both. In O'Connor v. American Mutual Liability Ins. Co., supra, we said:
"An injured workman cannot recover compensation both for specific loss, such as a partial loss of the function of any member, and for temporary total disability. LSA-R.S. 23:1223 provides that where compensation has been paid under the disability provisions the amount of such payments shall be deducted from any compensation allowed for a specific loss, but as no payments at all have been made O'Connor is entitled to compensation for the permanent partial loss of function of the member which is greater than any compensation he would receive under the disability provisions. See Cooper v. Employers Liability Assurance Corporation, Limited, supra; Storm v. Johnson, supra; Ferguson v. Kellogg Lumber Co., La.App., 200 So. 36; Franklin v. Louisiana Highway Commission, La.App., 152 So. 604; McBride v. Natural Gas & Fuel Corporation, 9 La.App. 513, 119 So. 722."
If this method be applied in the case at bar, it immediately becomes obvious that the different parts of the judgment appealed from are inconsistent one with the other. As we read the judgment it condemns the defendants to pay compensation for total disability for 66 weeks, that is, the 48 weeks for which compensation was voluntarily paid and the 18 additional weeks shown in the judgment. The judgment then continues to award further compensation based on the partial loss of the use of the leg for 175 weeks less the 66 weeks for which maximum compensation was allowed. Therefore, under the judgment plaintiff will recover for total disability for 66 weeks and for partial loss of the use of the leg for an additional 109 weeks. As we have stated, the proper method would be to allow recovery for the partial loss of the use of the leg for 175 weeks, or to allow for total disability for 66 weeks, whichever of the two would produce the greater amount.
Since the allowance of $30 per week for 66 weeks would produce $1,980, whereas the allowance of $3.18 per week for 175 weeks would produce only $556.50, it follows that, if the judgment is correct in other respects, plaintiff should have been allowed $30 per week for 66 weeks and should not have been allowed any additional amount for partial loss of the use of the member. However, defendants neither appealed nor answered the appeal of plaintiff and we are powerless to amend the judgment in their favor.
We deem it proper to state at this point that we now feel that we were in error when, in Bean v. Higgins, La.App., 78 So. 2d 245, 249, having found that plaintiff "was able to resume his former employment" but had sustained a seven per cent impairment of the use of the right hand, we awarded compensation on the basis of the difference between the wages he was earning at the time of the accident and the wages he would have been able to earn thereafter. In other words, we awarded compensation on the basis of disability, whereas it should have been fixed in accordance with the impairment of the use of the member. That is unimportant here since the Supreme Court ultimately reversed our decree in that case, 88 So.2d 30.
Our conclusion is that the judgment appealed from cannot be amended. Accordingly, it is affirmed at the cost of appellant.
Affirmed.
REGAN, Judge.
I respectfully concur.